# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

No. 12-70029

_____

United States Court of Appeals
Fifth Circuit

**FILED**

April 15, 2014

Lyle W. Cayce
Clerk

LICHO ESCAMILLA,

Petitioner-Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent-Appellee

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before SMITH, DENNIS, and HAYNES, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

Licho Escamilla seeks a certificate of appealability ("COA") to appeal the district court's denial of his habeas corpus petition under 28 U.S.C. § 2254, claiming that he was deprived his Sixth Amendment right to effective assistance of counsel when his trial attorneys failed to adequately investigate and present mitigation evidence at the punishment phase of his capital murder trial. He additionally asserts that *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) compels the federal habeas court to consider newly presented evidence that was never submitted to the state habeas court.

For the reasons that follow, we grant a COA as to petitioner's claim that trial counsel's failure to investigate and present adequate mitigating evidence violated his Sixth Amendment right to effective assistance of counsel, and deny a COA with regard to the argument that *Martinez v. Ryan* compelled the district court to consider new evidence to support his ineffective-assistance-of-trial-counsel claim.

## I.

The Petitioner, Licho Escamilla ("Licho")[1] was convicted by a jury of the capital murder of a Dallas Police Officer, Christopher James.  At the guilt / innocence phase of trial, the State of Texas presented evidence that on November 24, 2001, Officer James, along with three other Dallas Police Officers, were working off-duty as security for DMX, a Dallas nightclub.  Licho, who at the time was nineteen years old, was walking towards the valet stand in the parking lot of DMX when he became involved in a physical confrontation with three other males.  James and another off-duty officer working at the DMX nightclub responded to the disturbance in the parking lot.  As the officers approached, Licho repeatedly fired gun shots towards the officers, wounding them both, and causing James to fall to the floor.  The officers fired back, causing Licho to suffer a minor gun-shot wound.

While attempting to flee the scene, Licho paused where Officer James had fallen and fired additional close-range, fatal shots aimed at James' head. After two other officers continued exchanging fire with Licho, he was apprehended, arrested, and taken to the hospital to treat his gun-shot wound. Witnesses testified at trial that in the hospital immediately after the incident, Licho was laughing and repeatedly boasted about how he shot a "faggot cop."

---

[1] For ease of reference, petitioner and members of his family who share the same surname will be referred to by his or her first name.

At the punishment proceeding, the State presented evidence regarding Licho's past criminal history and juvenile delinquency record. The State also presented evidence that shortly before the DMX nightclub incident, Licho shot and killed a man named Michael Torres.

The defense began by presenting the testimony of Jose Alfonso Escamilla, Licho's father. Jose Alfonso testified that their family was close, and that Licho had a gentle nature and a close and affectionate relationship with his mother, who passed away a few years before trial. Jose Alfonso recalled that Licho's personality changed after his mother's death, explaining that "when [Licho] didn't have his mother [] he also wanted to die." On cross-examination, the State elicited that Jose Alfonso did his best to advise Licho about right from wrong, and encouraged Licho to recognize that his decisions have consequences. Jose Alfonso testified that he and his wife spoke to Licho "a lot . . . [and provided] a lot of advice." He agreed with the prosecution that Licho failed to heed this advice, despite the fact that Jose Alfonso "did everything he could" as a father.

Next, the defense presented the testimony of Brenda Hinjosa, Licho's older half-sister that lived in the Escamilla household while Licho was growing up. Brenda likewise testified to Licho's strong relationship with his mother and the effect her death had upon him, recounting that after his mother's death, Licho couldn't sleep, wouldn't eat, and lost a lot of weight. Brenda recalled that Licho started drinking more alcohol than he previously had, but stated that she had "never considered him a drinker." Additionally, two of Licho's former neighbors and Jose Cisneros, an old friend of the Escamillas, testified for the defense.

The State's closing argument at the sentencing phase focused on the brutal nature of the killing of Officer James, the Michael Torres murder, and—

3

significant for purposes of the current proceeding—on Licho's supportive and stable upbringing. The prosecutor argued to the jury:

> He was raised in a loving supportive family. Parents that were hard working, parents that tried to show him the right way. Taught him right from wrong. *There was [sic] no disadvantages in his background.* He had people that loved him and was surrounded by that and what did he do? He threw all that back in their face. . . . He's the one that chose not to be peaceful and law abiding, like his parents tried to show—that they wished he would have. . . . That's his background. He doesn't get any [mitigation] credit for that.

On rebuttal, the prosecutor continued this line of argument:

> This case isn't about events in [Licho's] life, it's about choices that he's made. Choices that he's made. And, please think about this, *this isn't a situation that we see so many times and hear about where someone becomes a law breaker because, they have had either an abusive or no proper upbringing.* Think about it. That's not the case here. You listened to his father. You listen to him testify. *He had loving parents that were role models. I listen to Mr. Escamilla and I thought to myself, if I were a parent, what more could he have done?* He works seven days a week, he repeatedly tried to tell his son about right choices to make, about right and wrong and about consequences if you don't do that. As did Licho Escamilla's mother, during her lifetime. Not one time, but according to Mr. Escamilla, a number of times. And, he ignored it all. He chose to ignore what his parents were telling him over and over.

During the defense's closing argument at the punishment phase, counsel pleaded with the jurors to hold the prosecution to its burden of proof. Defense counsel also reminded the jurors of how harsh a life sentence is and that the death penalty in some ways is not the worst punishment available to the jury, arguing that the jurors themselves "wouldn't want to be in prison with people like Licho Escamilla." With regard to Licho's background, counsel explained that "until he was about the age of eleven or so, [Licho] was a pretty normal kid." Defense counsel discussed a physical assault Licho suffered at the hands

of two adult males at the age of eleven[2] and argued that after this incident and his mother's death, Licho began to encounter "two ingredients, that *there is no evidence where much was involved in his life before*"—weapons and alcohol. Counsel reminded the jurors that neither "ingredient" would be available to Licho in prison if he were to serve a life term.

The jury found that there was a probability beyond a reasonable doubt that Licho would commit criminal acts of violence that would constitute a continuing threat to society and that there are insufficient mitigating circumstances to warrant the imposition of a sentence of life imprisonment rather than a death sentence. Licho was sentenced to death on October 31, 2002. Licho's conviction was affirmed on direct appeal by the Texas Court of Criminal Appeals on June 30, 2004.

In 2006, Licho filed a state habeas petition asserting, *inter alia,* an ineffective-assistance-of-counsel claim based on his trial attorneys' failure to investigate and present adequate mitigating evidence. Licho contended that his defense attorneys relied primarily upon the State's records, which were "replete with redactions," that counsel only met with two of his family members, and consequently failed to uncover and present evidence that Licho suffered from a violent and abusive upbringing or that he had untreated substance abuse problems. Licho additionally contended that because counsel did not have sufficient information regarding Licho's familial and social history, the expert psychiatrist who was consulted during trial was unable to make a fully informed diagnosis of Licho's mental health status. Moreover,

---

[2] Brenda Hinjosa testified for the defense that when Licho was eleven years old, he was severely physically assaulted by two adult males at a party who mistook Licho for one of his friends. Licho's older brother, Jose, Jr., who was fourteen at the time, retaliated against the adult men by shooting at them with a firearm. One of the men suffered a gunshot wound and thereafter Jose, Jr. was adjudicated a juvenile delinquent for the assault offense and was sent to a juvenile detention center for one year.

because of counsel's limited knowledge of Licho's social history, the prosecution was able to successfully convince the jury that Licho was the "black sheep" of a stable, loving family and that despite his responsible, hard-working parents who served as role models, Licho remorselessly chose to engage in a violent life of crime.

Licho's state habeas counsel procured the help of Toni Knox, a mitigation investigator, who uncovered detailed evidence regarding Licho's troubled childhood which was not presented to the jury at his sentencing trial. Attached to the state habeas was an unredacted version of Licho's records from a juvenile detention facility, the Texas Youth Commission ("TYC")—the redacted version of which had been provided to trial counsel—revealing the troubling extent of Licho's substance abuse problems. Additionally, the state habeas petition included various affidavits and records that together portrayed a troublesome social and family history, including evidence that, *inter alia*: Licho's father was an abusive alcoholic, and often hit the children with a belt or punched them with his bare hands; Licho and his siblings witnessed their father's physical abuse of their mother; Licho and his older brothers were involved with a gang from an early age and all sold and used drugs; as young as age five, Licho admired his older brother's gang involvement; Licho regularly and severely abused alcohol since age nine, he smoked marijuana as a child, and was unable to access recommended substance abuse treatment; and nearly all male members of Licho's immediate and extended family have significant criminal history records.

The petition also included evidence of trial counsel's limited and belated investigatory efforts. An affidavit from Brook Busbee, one of Licho's two trial attorneys, reveals that counsel never obtained an un-redacted copy of the TYC records. Additionally, several of the individuals interviewed by state habeas

counsel and their investigator attested that, despite having knowledge of mitigating evidence, they were never contacted by Licho's trial attorneys. The state habeas petition additionally included a letter report from Dr. Glen Pearson, addressed to Busbee, and dated November 29, 2002—approximately one month after Licho was sentenced to death. Pearson's letter indicates that he did not examine Licho until jury selection had begun, and was misinformed about Licho's familial background and social history.

In response to Licho's habeas petition, the State submitted affidavits from both of Licho's defense attorneys, C. Wayne Huff and Brook Busbee, as well as Ms. Busbee's legal assistant, Virginia McDonald. Busbee and Huff attested that several unsuccessful attempts were made to speak with both of Licho's brothers and other members of the family, that prior to trial, they held a four-hour meeting with Licho's father and half-sister in Busbee's office, and held two additional meetings with members of the Escamilla family. Both Huff and Busbee state that even after they specifically asked Licho and his family, no one mentioned any history of abuse or ever mentioned that Licho's father was an alcoholic. Rather, Licho and his family gave counsel the impression that his father was a responsible man and a good father. Busbee further attested that while she did not ask the court to appoint a mitigation expert, she had the help of a defense investigator who researched Licho's background on counsel's behalf, contacting various family members and "any friends and neighbors he could find." Busbee additionally hired two experts to assist in the mitigation investigation—Dr. Jay Crowder who performed an electroencephalography ("EEG") to evaluate Licho for organic brain damage, and Dr. Glen Pearson, who conducted a psychological evaluation consisting of an interview with Licho and a review of the TYC and medical records. Neither

expert found an "excuse or explanation" for Licho's behavior to support mitigation.

Substantially adopting the State's proposed findings of facts, the state habeas court denied Licho's petition, finding that he failed to establish that counsel's investigation and presentation of mitigation evidence amounted to deficient performance, or that any deficiency prejudiced the punishment proceeding.

On May 2, 2008, represented by new counsel, Licho filed his federal habeas petition that included new evidence of Licho's father's abuse against Licho's mother, as well as affidavits from two of the jurors who sentenced Licho to death,[3] and further evidence of Licho's extended family's criminal history. The district court denied Licho's petition. Licho then moved for a new trial pursuant to *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), seeking an "opportunity to challenge state habeas counsel's effectiveness." Licho argued that under *Martinez*, he is entitled to present and have a court consider the evidence submitted to the federal habeas court which was not before the state habeas court due to state habeas counsel's failures. The district court denied Licho's motion for a new trial on August 23, 2012, and Licho thereafter, timely moved for a COA.

## II.

A petitioner is required to seek a COA before an appeal of the district court's denial of his § 2254 habeas petition. 28 U.S.C. § 2253(c)(1). To obtain a COA, a prisoner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). If a district court has rejected a prisoner's constitutional claim

---

[3] Knox, the post-conviction mitigation specialist, interviewed two jurors and obtained affidavits from them attesting that the jurors would have considered additional family background information in mitigation had it been presented to them at sentencing.

on the merits, this court will issue a COA only if the prisoner demonstrates that jurists of reason could debate whether the district court's resolution of his constitutional claims were correct, or could conclude the issues presented are "adequate to deserve encouragement to proceed further." *Miller-El,* 537 U.S. at 336 (internal quotation marks and citation omitted). "A claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. As we have explained, the standard a petitioner must meet to be granted a COA in a death penalty case is less burdensome than in a non-capital case. *See Clark v. Thaler*, 673 F.3d 410, 425 (5th Cir. 2012) ("While the nature of a capital case is not of itself sufficient to warrant the issuance of a COA, in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor.") (quotation marks and footnote omitted). Accordingly, where the question is close, "any doubt as to whether a COA should issue in a death-penalty case must be resolved in favor of the petitioner." *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005).

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and its conclusions of law de novo, applying the same standards to the state court's decision as did the district court." *Lewis v. Thaler*, 701 F.3d 783, 787 (5th Cir. 2012) (quoting *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004)). Thus, the COA application is governed by the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See Miller v. Thaler*, 714 F.3d 897, 901 (5th Cir. 2013). In determining whether a COA should issue, we "view the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000); *see also Druery v. Thaler*, 647 F.3d 535, 538 (5th Cir. 2011). Under § 2254(d)(1), a state prisoner's "application for a writ of

habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Section 2254 creates a "highly deferential standard for evaluating state court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of showing that "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

### III.

The Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established the two-step process for assessing a Sixth Amendment claim of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

*Id.* at 687. To establish deficiency, the defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). However, the deference afforded counsel's informed, strategic choices, does not eliminate counsel's duty to "make

reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-91.

Under *Strickland*'s second prong, a petitioner must establish "that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687; *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009). Specifically, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

Applying *Strickland's* two-pronged inquiry, the Supreme Court has found that trial counsel's failure to adequately investigate available mitigating evidence—for example, by declining to follow up with possible witnesses, neglecting to prepare a mitigation defense until one week before trial, and failing to discover ample available documentary evidence—amounts to ineffective assistance of counsel. *See Williams v. Taylor,* 529 U.S. 362, 395 (2000). In *Williams*, defense counsel presented only the testimony from defendant's mother and two neighbors, one of whom was never previously interviewed by the attorneys, and simply was in the audience and called to testify on the spot. *Id.* at 369. In contrast to the limited mitigation case presented at trial, the state habeas court was presented with evidence that the defendant experienced a childhood fraught with mistreatment, neglect, and abuse, and that he was borderline mentally retarded and possibly had organic brain damage. *Id.* at 370. The Court held that counsel's failure to present this compelling mitigating evidence could not be "justified by a tactical decision," and thus fell below an objective standard of reasonableness. *Id.* at 395. The

Court next concluded that the petitioner was entitled to relief because he was prejudiced by counsel's failures, regardless of the fact that the evidence did not directly rebut the prosecution's evidence. *Id.* at 397-98. The Court explained that "mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Id.*

Likewise, in *Wiggins v. Smith,* 539 U.S. 510 (2003), the Court held that trial counsel's inadequate investigation of a capital defendant's social history and consequent failure to present mitigating evidence regarding the defendant's history of sexual abuse and other traumatic childhood events amounted to a violation of the defendant's Sixth Amendment right to effective assistance of counsel. The *Wiggins* Court found that counsel unreasonably relied upon a cursory review of the presentence investigation report and a social services record, despite indications in available records that Wiggins' mother was an alcoholic and that he was placed in foster care. *Id.* at 524-25. Thus, counsels' "decision to end their investigation when they did was . . . [not] reasonable in light of the evidence counsel uncovered in the social services records—evidence that would have led a reasonably competent attorney to investigate further." *Id.* Finding that the mitigating evidence presented at habeas proceedings sufficiently established a "reasonable probability that at least one juror would have struck a different balance," the Court reversed and remanded the case. *Id.* at 537-38.

Two years after *Wiggins* was announced, the Court issued *Rompilla v. Beard*, 545 U.S. 374 (2005), holding that Rompilla established ineffective assistance of counsel based on his trial attorneys' failure to review evidence provided by the prosecution which contained information that would lead a reasonable attorney to investigate further. In *Rompilla,* relying upon

defendant's own description of his childhood as "normal," trial counsel failed to thoroughly investigate the defendant's background and social history and instead presented a mitigation case consisting of the defendant's family pleading with the jurors for sympathy.[4]  *Id.* at 379.  Despite Rompilla's statements to the contrary, counsel was in possession of various documents indicating that Rompilla's childhood was anything but "normal."  *Id.* at 382. The Court explained that there was "room to debate" trial counsel's obligation to "follow at least some of these potential lines of enquiry" contained in the available document, but the Court did not expressly conclude whether counsel's inactions in this regard amounted to deficient performance.  *Id.* Instead, the Court resolved the case on one dispositive issue—that counsel failed to examine the very court file that the prosecutor informed counsel he would rely upon at sentencing.  *Id.* at 383.  The Court held that where capital defense attorneys have access to the prosecution's files and are provided notice that the prosecution will rely upon such information contained within the file at sentencing, yet neglect to review the file before trial, counsel performs below an objective standard of reasonableness.  *Id.* at 389 ("No reasonable lawyer would forgo examination of the file thinking he could do as well by asking the defendant or family relations").  Thus, regardless of other efforts made to investigate potential mitigating evidence, counsel was obligated to examine the prosecution's evidence in preparation of the punishment trial.  *See id.*

With regard to *Strickland*'s second prong, the *Rompilla* Court explained that the prison files that counsel failed to examine portrayed the defendant's childhood and mental health status much differently than the information

---

[4] Before trial, Rompilla's counsel made some investigatory efforts, including interviews with the defendant and five members of his family, and consultations with three mental health experts.  *Rompilla,* 545 U.S. at 379.  However, none of the mental health experts were aware of the defendant's social history.  *Id.* at 392.

received by the defendant's family and provided by the mental health experts. If counsel had reviewed the contents of the prosecutor's file and other readily available documents, they likely would have uncovered other mitigating evidence regarding Rompilla's parents' alcoholism and domestic violence issues, as well as the severe discipline and harsh living conditions he endured as a child. *Id.* at 391-93 ("While [trial counsel] found nothing helpful to Rompilla's case, their postconviction counterparts, alerted by information from school, medical, and prison records that trial counsel never saw, found plenty of red flags pointing up a need to test further.") (internal quotation marks, citation, and alteration omitted). Thus, petitioner established prejudice under *Strickland* because "the undiscovered 'mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Rompilla's] culpability, and [thus] the likelihood of a different result if the evidence had gone in[,] is sufficient to undermine confidence in the outcome actually reached at sentencing." *Id.* at 393 (quotation marks and citations omitted).

More recently, in *Sears v. Upton*, 130 S. Ct. 3259 (2010), the Court remanded for reconsideration of the prejudice prong, clarifying that when conducting a prejudice analysis under *Strickland* in the capital sentencing context, a habeas court must consider the totality of all mitigation evidence—evidence presented both at trial and in habeas proceedings—and reweigh it against the aggravating evidence, regardless of whether trial counsel initially presented some evidence of mitigation at the punishment proceeding. In *Sears*, trial counsel presented mitigating evidence of the petitioner's stable, loving upbringing, presumably as an attempt to show the grave impact of the death penalty upon the petitioner's family. *Sears*, 130 S. Ct. at 3261-62. In response, the prosecution used this depiction of a stable family against the defense, arguing to the jury that the defendant was "privileged in every way, [and]

14

rejected every opportunity that was afforded him." *Id.* at 3262. Rather than the stable, loving upbringing depicted at trial, post-conviction counsel discovered that the defendant's parents were actually physically and verbally abusive, that the defendant was subjected to sexual abuse by a male cousin, struggled in school with a severe learning disability, and post-conviction testing revealed that the petitioner had significant brain abnormalities that were likely a result of head injuries and drug and alcohol abuse as a teen. *Id.* Post-conviction counsel additionally unveiled evidence that Petitioner's brother was a convicted drug dealer and user, who "introduced Sears to a life of crime." *Id.* at 3263. The Court reasoned that this new information, even taken together with some adverse evidence uncovered during the post-conviction investigation, "might not have made Sears any more likeable to the jury, but might well have helped the jury understand Sears, and his horrendous acts—especially in light of the purportedly stable upbringing." *Id.* at 3264.

Applying *Strickland*, *Wiggins*, and *Rompilla*, we have explained that, "[i]n investigating potential mitigating evidence, counsel must either (1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is unnecessary." *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013). Thus, "under a *Strickland* analysis, trial counsel must not ignore pertinent avenues of investigation, or even a single, particularly promising investigation lead." *Id.* at 390 (internal citations and quotation marks omitted). Accordingly, we have granted a COA to a petitioner who demonstrated that despite some efforts by counsel to investigate and present a mitigation defense, the scope and adequacy of counsel's mitigation investigation was debatably unreasonable. *Smith v. Dretke*, 422 F.3d 269, 280 (5th Cir. 2005). In *Smith,* the petitioner argued that counsel failed to

investigate his "troubled background and abusive upbringing," failed to review his prison records that demonstrated his good behavior, and neglected to present expert testimony regarding his drug and alcohol use. *Id.* at 277. Smith's trial counsel submitted affidavits asserting that they extensively interviewed Petitioner's family members and acquaintances. *Id.* Relying on *Rompilla*, we reasoned that regardless of extensive interviews with family members, counsel had information available to them—here, that Smith had a history of severe substance abuse and that Smith came from a disadvantaged background—that would have led a reasonable attorney to investigate further, and thus the scope of their investigation was unreasonable. *Id.* at 283-84 ("[E]ven though trial counsel did do some investigating, the question was whether the investigation conducted could be considered adequate in light of professional norms."). With regard to the prejudice prong, we held that compared to the evidence actually presented at the punishment proceeding, "reasonable jurists could debate whether the evidence Smith now proffers would have convinced a juror that Smith was less morally culpable such that life imprisonment, rather than the death penalty, was appropriate." *Id.* at 284.

**IV.**

Licho's post-conviction counsel presented the state habeas court with evidence that the sentencing jury never heard, which revealed Licho's severe substance abuse problems that began at age nine, his involvement with a gang from age eight, his father's abuse, alcoholism, and harsh disciplinary practices, his family's substantial involvement with the criminal justice system, and Licho's brother's negative influence on him at an impressionable age. The state habeas court concluded that despite trial counsel's failures to uncover and present this mitigating evidence, trial counsel's representation did not fall below an objective standard of reasonableness, nor did the absence of this

16

mitigating evidence prejudice Licho.  Reasonable jurists could debate that the state habeas court unreasonably applied *Strickland* and its progeny when it concluded that counsel's limited mitigation investigation and presentation during sentencing was not deficient despite the available, unpursued "red flags" regarding Licho's troubled childhood, and that regardless of any deficiency Licho could not establish prejudice.  Accordingly, we grant Licho a COA with regard to his ineffective-assistance-of-trial-counsel claim, reserving a decision on this issue until the matter is fully briefed and submitted.

### A.  Deficiency of Mitigation Investigation

The state habeas court considered counsel's qualifications, their meetings with Licho and his family members, as well as their retention and use of a defense investigator and two medical experts, and concluded that the State presented affirmative evidence of counsel's effective representation.  The state habeas court further reasoned that counsel made repeated, yet unsuccessful, attempts to meet with various members of Licho's family, who were difficult to communicate with and expressly denied the existence of some of the mitigating evidence that post-conviction counsel later uncovered.  Accordingly, the state habeas court found that trial counsel cannot be faulted for their inability to obtain the mitigating evidence that state habeas counsel later uncovered—namely, Licho's father's physical abuse of his children and wife, as well as his use of harsh disciplinary methods.

Reasonable jurists could debate whether in concluding that counsel's mitigation investigation amounted to effective representation, the state habeas court unreasonably applied *Strickland* and its progeny, which requires counsel to reasonably pursue investigation of available leads, regardless of a client's obstructive behavior or concealment of evidence.  *See, e.g.*, *Sonnier v. Quarterman*, 476 F.3d 349, 362 (5th Cir. 2007).  A number of considerations

17

lead us to conclude that a COA is warranted with regard to Licho's ineffective-assistance-of-trial-counsel claim. First by counsels' admission, they neglected to obtain the unredacted version of Licho's TYC records or the publicly available arrest records of Licho's family members. Second, counsel spent only a limited amount of time interviewing a select handful of Licho's family members and acquaintances, and unreasonably relied upon their description of Licho's childhood as stable. Third, counsel declined to hire a mitigation specialist, failed to obtain a psychological evaluation for their client until after trial began, and failed to ensure that the expert evaluating Licho was aware of his family background and social history. Fourth, reasonable jurists could debate whether counsel failed to conduct a timely mitigation investigation. These failures debatably amount to deficient performance under *Strickland* and its progeny because together, they could reflect a mitigation investigation that fell below an objective standard of reasonableness. *See, e.g.*, *Wiggins,* 539 U.S. at 527-28 (finding that in light of the evidence contained in available records, counsel "abandoned their investigation at an unreasonable juncture," and thus the state habeas court unreasonably applied *Strickland* when it found that counsel's investigation was reasonable).

**B. Presentation of Mitigation Defense**

Because counsel's mitigation investigation was debatably unreasonable, we now turn to examine whether the state habeas court unreasonably deferred to counsels' purportedly strategic choice to present a mitigation theory premised upon evoking sympathy from the jurors for Licho's family, despite available "red flags" indicating Licho's troubled childhood. The state habeas court found that counsel was aware of Licho's history of substance abuse and his brothers' criminal histories, yet strategically and reasonably chose not to present this evidence to the jury, and instead made an informed decision to

present Licho and his family as sympathetic figures, arguing that Licho changed after his mother died. As Busbee explained, she "believed then and believes now that the best mitigation strategy was to focus on the tragedy it would be for Escamilla's father to lose both his wife and then his son."

Generally, counsel's strategic decisions are afforded deference so long as they are based on counsel's "professional judgment." *Strickland*, 466 U.S. at 680. However, if a purportedly tactical decision is not preceded by a reasonable investigation, then it is not sufficiently informed and not entitled to the deference typically afforded counsel's choices. *See Sears*, 130 S. Ct. at 3265 ("We reject[] any suggestion that a decision to focus on one potentially reasonable trial strategy. . . . [i]s 'justified by a tactical decision' when 'counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background'"); *see also Smith,* 422 F.3d at 284 ("If trial counsel's investigation was unreasonable then making a fully informed decision with respect to sentencing strategy was impossible"). Accordingly, because counsel's investigation debatably fell below a reasonable standard of performance, reasonable jurists would in turn debate whether the "state habeas court's decision to give deference to trial counsel's strategic decision [is] also . . . objectively unreasonable." *Smith,* 422 F.3d at 284.

## C. Prejudice

Next, reasonable jurists could debate whether the state habeas court unreasonably applied federal law when it rejected Licho's argument that but for counsel's failures, there was a reasonable probability of a different outcome that undermines confidence in the imposition of the death sentence. *Strickland*, 466 U.S. at 694. The jury that sentenced Licho to death was presented with evidence that Licho was a "pretty normal" kid until age eleven.

19

The state habeas court found that trial counsel did present a reasonable mitigation case to the jurors. However, reasonable jurists would debate whether trial counsel's efforts were unreasonably inadequate when compared to "their postconviction counterparts, [who,] alerted by information from . . . records that trial counsel never saw, found plenty of red flags," and as a result, discovered evidence that trial counsel failed to uncover and present to the jury. *Rompilla,* 545 U.S. at 391-93. Moreover, the evidence presented to the state habeas court that the jury never heard directly rebutted the prosecution's theory during punishment that Licho was "raised in a loving supportive family," and that there were "no disadvantages in his background." The prosecution urged the jury to disregard any potential mitigating value of the defense's evidence because the testimony during the punishment proceeding established that Licho was a privileged child, with loving, hard-working parents, who simply made "choices" to break the law and inexplicably choose to kill. The defense failed to rebut this allegation and never presented the jury with information regarding the disadvantages, instability, and trauma that Licho actually experienced as a child.

Further, the state habeas court reasoned that the evidence regarding Licho's father's abuse and alcoholism was not sufficient in quality or quantity to evoke much sympathy from the jury. With regard to the evidence of Licho's severe substance abuse problems as well as the evidence that Licho was influenced by his brother Jose, Jr., the state habeas court found that this evidence was unlikely to "tip the scales" in Licho's favor, and cites to Busbee's declaration that she felt the "evidence of the murder of Officer James and the previous murder that he was wanted for when he killed Officer James was too powerful to overcome." However, this court has found that counsel's failure to present the true nature of the petitioner's disadvantaged upbringing debatably

20

establishes prejudice even when the petitioner was convicted of committing a series of senseless murders. *Smith,* 422 F.3d at 271-72 (detailing the petitioner's "week-long crime spree" and ultimately granting a COA on his ineffective-assistance-of-trial-counsel claim). Thus, the disturbing facts of the crime alone do not defeat Licho's prejudice argument.

Reasonable jurists would debate whether the state habeas court's conclusion that Licho failed to establish a reasonable probability of a different outcome is an unreasonable application of *Strickland* and its progeny. Accordingly, his ineffective-assistance-of-counsel claim based upon trial counsel's failures to investigate and present a mitigation defense deserves encouragement to proceed further. We therefore grant a COA on that issue.

## V.

Turning to Licho's second argument on appeal, we conclude that he has not made the requisite showing to warrant a COA regarding his claim that under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), the district court should have considered newly presented evidence that state habeas counsel neglected to present to the state habeas court. Less than one week before the district court denied Licho's federal habeas petition, the Supreme Court issued its opinion in *Martinez v. Ryan,* ruling that "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* at 1320. *Martinez* addressed the Arizona state law system of collateral review, but in 2013, the Court applied the *Martinez* rule to petitioners raising defaulted ineffective-assistance-of-trial-counsel claims in Texas. *Trevino v. Thaler,* 133 S. Ct. 1911, 1915 (2013). Thus, if a

21

petitioner in Texas establishes that he has a "substantial" claim of ineffective-assistance-of-trial-counsel, which is otherwise procedurally barred due to the ineffective assistance of his state habeas counsel, he can establish cause to cure the procedural defect.  *Id.* at 1921.

Prior to *Martinez* and *Trevino*, in *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011), the Court held that once a claim has been adjudicated on the merits in a state habeas court, additional evidence submitted to the federal habeas court "has no bearing" on the federal habeas court's decision.  *Id.* at 1400.  Rather, "a federal habeas petitioner must [establish that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law] on the record that was before the state court."  *Id.*; *see also Clark v. Thaler*, 673 F. 3d 410, 417 (2012) (applying *Pinholster* and concluding that the federal court must "consider only the record that was before the state habeas court").

After Licho's federal habeas petition was denied, he filed a motion for a new trial and for oral argument, asserting that in light of *Martinez*, he is entitled to argue his state habeas counsel's ineffectiveness, and contending that the federal habeas court should have considered all of the evidence presented during the federal proceedings, inclusive of any evidence not made part of the state habeas court record, because any "evidentiary shortcomings" in his state habeas petitioner were a result of state habeas counsel's ineffectiveness, and thus "do not preclude [the federal habeas court] from considering the extensive affidavit testimony provided by Petitioner's witnesses."

In *Martinez,* the Court held that an otherwise procedurally defaulted *claim* of ineffective assistance of counsel may be heard by a federal habeas court where it was not properly raised in the state habeas court on initial

review due to state habeas counsel's ineffective representation.  We conclude that *Martinez* does not apply to claims that were fully adjudicated on the merits by the state habeas court because those claims are, by definition, not procedurally defaulted.  *See, e.g.*, *Moore v. Mitchell*, 708 F.3d 760, 784-85 (6th Cir.), *cert. denied*, 134 S. Ct. 693 (2013); *c.f. Dickens v. Ryan*, 740 F.3d 1302, 1320 (9th Cir. 2014) (allowing the federal habeas court to consider new evidence that "fundamentally altered" the previously asserted claim of ineffective-assistance-of-trial-counsel, explaining that the *Pinholster* Court's prohibition applies "only to claims 'previously adjudicated on the merits in State court proceedings'").  Thus, once a claim is considered and denied on the merits by the state habeas court, *Martinez* is inapplicable, and may not function as an exception to *Pinholster*'s rule that bars a federal habeas court from considering evidence not presented to the state habeas court.  *See Gallow v. Cooper*, 505 F. App'x 285, 291 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 2730 (2013); *Ross v. Thaler*, 511 F. App'x 293, 305 (5th Cir.), *cert. denied*, 134 S. Ct. 23 (2013).

Here, Licho's ineffective-assistance-of-trial-counsel claim based on his attorneys' failure to investigate and present mitigating evidence was considered and denied by the state habeas court.  The new evidence presented to the district court did not "fundamentally alter" his claim, *Dickens*, 740 F.3d at 1320, but merely provided additional evidentiary support for his claim that was already presented and adjudicated in the state court proceedings.  Thus, *Martinez* is inapplicable, and *Pinholster* bars Licho from presenting new evidence to the federal habeas court with regard to this already-adjudicated claim.  *Clark*, 673 F.3d at 417.

## CONCLUSION

23

24

We hold that Licho has made the requisite showing to warrant a COA with regard to his ineffective-assistance-of-trial-counsel claim, and grant a COA as to that issue. However, we deny a COA with regard to Licho's arguments under *Martinez v. Ryan* and therefore limit his arguments on appeal to those arising from and supported by the record presented to the state habeas court.

Accordingly, Licho's application for a COA is GRANTED in part and DENIED in part.